UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICTORIA ANN FLENNER,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | No.  2:12-cv-0897-KJN<br><br><br><br>ORDER |

　　　　　Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").[1]  In her motion for summary judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was not disabled from May 3, 2003, plaintiff's alleged disability onset date, through September 30, 2008, the date on which plaintiff was last insured.  (ECF No. 15.)  The Commissioner filed a cross-motion for summary judgment and an opposition to plaintiff's motion.  (ECF No. 16.)  Thereafter, plaintiff filed a reply brief.  (ECF No. 17.)

---

[1] This action was initially referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15), and both parties voluntarily consented to proceed before a United States Magistrate Judge for all purposes.  (ECF Nos. 7, 9.)

1

For the reasons that follow, the court denies plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment for the Commissioner.

I.    BACKGROUND

Plaintiff was born on April 28, 1961, has at least a high school education, and previously worked as a credit manager, office manager, branch manager, office supervisor, and accounting supervisor.[2]  (Administrative Transcript ("AT") 40, 44, 51, 55, 142.)  Around November 28, 2007, plaintiff applied for DIB, alleging that she was unable to work as of May 3, 2003, primarily due to problems in her ankles and knees, diabetes, and depression.  (AT 37, 51, 135.)  On September 8, 2008, the Commissioner determined that plaintiff was not disabled.  (AT 37, 51, 56-60.)  Upon plaintiff's request for reconsideration, the determination was affirmed on April 20, 2009.  (AT 37, 55, 65-69.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on April 28, 2010, and at which plaintiff (represented by counsel), plaintiff's husband, and a vocational expert ("VE") testified.  (AT 13-31, 37.)

In a decision dated August 11, 2010, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from May 3, 2003, plaintiff's alleged disability onset date, through September 30, 2008, plaintiff's date last insured.  (AT 37-45.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 10, 2012.  (AT 1-5.)  Thereafter, plaintiff filed this action in federal district court on April 6, 2012, to obtain judicial review of the Commissioner's final decision.  (ECF No. 1.)

II.   ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the ALJ violated Social Security Ruling 02-1p in analyzing plaintiff's obesity and its impact on her functioning; and (2) whether the ALJ improperly discounted the opinion of consultative examining psychiatrist Dr. Wong.

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical and mental health history, the court does not exhaustively relate those facts in this order. The facts related to plaintiff's impairments and treatment will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

III. LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

IV. DISCUSSION

A. Summary of the ALJ's Findings

The ALJ evaluated plaintiff's entitlement to DIB pursuant to the Commissioner's standard five-step analytical framework.[3] As an initial matter, the ALJ found that plaintiff remained

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past relevant work? If so, the

3

insured for purposes of DIB through September 30, 2008.  (AT 39.)  At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful activity during the period from her alleged disability onset date of May 3, 2003, through her date last insured of September 30, 2008.  (Id.)  At step two, the ALJ determined that plaintiff had the following severe impairments through the date last insured: left knee ligament dysfunction and a fracture of the left tibia-fibula.  (Id.)  However, at step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 40.)

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a wide range of light work as defined in 20 CFR 404.1567(b).  [S]he can lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk 2 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.

(AT 40.)

At step four, the ALJ found, based on plaintiff's RFC and the vocational expert's testimony, that plaintiff was capable of performing her past relevant work as a credit manager, office manager, branch manager, office supervisor, and accounting supervisor (which were all sedentary occupations) through the date last insured.  (AT 44.)  Accordingly, the ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from May 3, 2003, plaintiff's alleged disability onset date, through September 30, 2008, the date last insured.  (Id.)

---

claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

4

B.       Plaintiff's Substantive Challenges to the Commissioner's Determinations

      1.       <u>Whether the ALJ violated Social Security Ruling 02-1p in analyzing plaintiff's obesity and its impact on her functioning</u>

In this case, plaintiff's treatment records document her complaints of knee, leg, ankle, foot, hip, back, hand, elbow, arm, neck, and shoulder pain; surgeries related to a left knee ligament reconstruction, left knee arthroscopy, and a fracture of her left leg; and diagnoses of degenerative arthritis, degenerative joint disease, diabetes, and potential carpal tunnel syndrome. (See generally AT 213-347, 389-406, 432-62.) The record contains numerous diagnostic imaging studies which, apart from plaintiff's ultimately repaired fracture injuries, mostly documented normal or relatively mild degenerative findings. (Id.)

At the time of the administrative hearing, plaintiff was 5' 2'' tall and weighed 250 pounds, which amounted to a Body Mass Index ("BMI") of approximately 45.7, with a BMI of 30 or greater indicating obesity. (AT 16, 464.) There is no serious dispute that plaintiff's obesity exacerbates the symptoms attributable to her other conditions to some extent. For example, the treatment notes document that plaintiff has been advised to lose weight in order to reduce her leg/knee pain. (See, e.g., AT 271 ["Pt has DJD and there is not much that could be done except supartz injections…She can also lose weight. She is about a hundred pounds overweight."]; AT 273 ["She has osteoarthritis in the knee which will continue to give her pain unless she loses significant weight."].)

The pertinent question in this case is the degree to which plaintiff's obesity impacts her other symptoms and functional limitations, and whether their combined effect renders her disabled. Although none of plaintiff's treating physicians submitted assessments of her physical functional capacity, plaintiff was evaluated by two consultative examiners – Dr. Jenna Brimmer (who was board certified in internal medicine) and Dr. Fariba Vesali (who was board certified in physical medicine and rehabilitation)—on whose opinions the ALJ substantially relied to formulate plaintiff's RFC. (AT 348-53, 409-13.)

On this appeal, plaintiff does not challenge the substance of the consultative examiners' opinions or the weight that the ALJ gave those opinions. Instead, plaintiff contends that the ALJ

5

failed to consider the interactive effects of plaintiff's obesity on her other impairments, in violation of SSR 02-1p. For the reasons discussed below, that argument lacks merit.

SSR 02-1p provides, in part, as follows:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time...In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

SSR 02-1p, at *6. For these reasons, when a claimant raises an issue concerning her obesity, or the record evidence reasonably triggers the ALJ's duty to independently inquire into the potential effects of a claimant's obesity, the ALJ must consider the interactive effect between the claimant's obesity and other conditions. Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir. 2003).

Nevertheless, as SSR 02-1p also makes clear, certain BMI levels may indicate obesity and the extent of obesity, but they "do not correlate with any specific degree of functional loss." SSR 02-1p, at *2. SSR 02-1p further notes that the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the

1    case record." SSR 02-1p, at *6.

2    Here, the ALJ's decision explicitly considered plaintiff's obesity, noting that "the claimant
3    has a Body Mass Index of 45.7 [Ex. 21F2], indicating extreme obesity. However, no treating or
4    examining physician herein has opined obesity causes more than a minimal loss of function.
5    Accordingly, the undersigned finds obesity is not a severe impairment, even assuming it
6    exacerbates the claimant's symptoms." (AT 44.) Based on this isolated portion of the ALJ's
7    decision, plaintiff argues that the ALJ only considered limitations caused by plaintiff's obesity
8    alone and failed to consider their interactive effect with limitations caused by other impairments.
9    However, plaintiff's argument ignores the ALJ's thorough summary of the treatment records and
10   other medical evidence that preceded that portion of the decision, including the ALJ's
11   consideration of the opinions of consultative examiners Drs. Brimmer and Vesali, which clearly
12   took account of plaintiff's obesity. (AT 41-44.)

13   Consultative examiner and board certified internal medicine physician, Dr. Brimmer, who
14   reviewed plaintiff's medical records and examined plaintiff on June 23, 2008, specifically noted
15   that plaintiff was obese with a height of 5'2'' and a weight of 229 pounds. (AT 348, 350, 353.)
16   Based on a physical examination of plaintiff, Dr. Brimmer diagnosed plaintiff with (1) left knee
17   pain status post two arthroscopic surgeries, with some decreased knee range of motion, decreased
18   strength, atypical exam, and abnormal station and gait; (2) recent left tibia and fibula fracture
19   requiring surgery, with hardware in place and some ankle swelling; (3) type II diabetes; and (4) a
20   history of depression and anxiety (with assessment deferred to a mental health specialist). (AT
21   352.) Dr. Brimmer opined that plaintiff could stand/walk for 6 hours in an 8-hour workday; sit
22   without limits; lift and carry 20 pounds occasionally and frequently; and bend or stoop without
23   limits, but crouch only occasionally. (Id.) Dr. Brimmer assessed no manipulative, visual,
24   communicative, or environmental limitations, but indicated that plaintiff would benefit from a
25   cane for long distances and uneven terrain. (AT 352-53.) According to Dr. Brimmer, these
26   limitations would be present for at least six months after plaintiff's surgery. (AT 352.)

27   Consultative examiner Dr. Vesali, who was board certified in physical medicine and
28   rehabilitation, reviewed plaintiff's medical records, and performed an orthopedic evaluation of

plaintiff on March 31, 2009, likewise noted plaintiff's height of 5'2'' and weight of 220 pounds. (AT 409-10, 413.)  After completing her physical examination, Dr. Vesali diagnosed plaintiff with (1) chronic left knee pain status post left knee ligament reconstruction in 2008, status post left tibia-fibular fracture status post open reduction internal fixation; (2) possible left knee osteoarthritis; and (3) myofascial neck and right upper extremity pain.  (AT 412.)  Dr. Vesali opined that plaintiff could stand/walk for 4 hours in an 8-hour day; sit for 6 hours in an 8-hour day, with breaks every two hours for stretching; and lift/carry 10 pounds frequently and 20 pounds occasionally.  (AT 412-13.)  Plaintiff did not need an assistive device for ambulation and had no manipulative or environmental limitations, but Dr. Vesali noted that plaintiff should not engage in frequent climbing, crouching, kneeling, and crawling.  (AT 413.)

Both consultative examiners personally examined plaintiff and reviewed plaintiff's medical records, and, as such, these examiners were well aware of plaintiff's obesity when they assessed plaintiff's functional limitations.  Indeed, their reports set forth detailed and thorough clinical findings, including notations regarding plaintiff's height, weight, and resultant obesity.  It is certainly well within their clinical expertise to opine as to the functional limitations resulting from all of plaintiff's combined impairments, including plaintiff's obesity.  In formulating plaintiff's RFC, the ALJ substantially relied on these opinions and in fact gave plaintiff the benefit of the doubt by assessing slightly more restrictive limitations than those assessed by Drs. Brimmer and Vesali – in particular, finding that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand/walk for only 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.  (AT 40.)[4]

////

---

[4] Although the ALJ did not expressly incorporate Dr. Vesali's limitation of breaks every 2 hours for stretching, this was not necessary, because normal breaks include "a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SSR 96-9p, at *6. Furthermore, even though the ALJ did not include the consultative examiners' suggested postural limitations (limitations to occasional or less than frequent postural activities) in plaintiff's RFC, any error in that regard was harmless, because plaintiff's past relevant work was comprised of sedentary occupations, and significant postural activities are not usually required in sedentary work. SSR 96-9p, at **7-8.

Therefore, the court finds that the combined or interactive effect of plaintiff's obesity and other impairments was appropriately considered in formulating plaintiff's RFC. As such, any failure by the ALJ to more precisely articulate the obesity impact analysis in the decision was harmless error. See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error analysis applicable in judicial review of social security cases).[5]

    2.    <u>Whether the ALJ improperly discounted the opinion of consultative examining psychiatrist Dr. Wong</u>

The record in this case also contains no mental functional capacity assessment by a treating source, but plaintiff underwent a consultative psychiatric examination by board certified psychiatrist Dr. Patrick Wong. (AT 354-56.) Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for discounting the opinion of Dr. Wong.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. Lester, 81 F.3d at 830-31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ

---

[5] To the extent that plaintiff contends that the ALJ erred in not finding plaintiff's obesity to be a severe impairment at step two, any such error was also harmless, because, for the reasons discussed above, plaintiff's obesity was appropriately considered at subsequent steps in the sequential evaluation process.

9

may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[6] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

Consultative examining psychiatrist Dr. Wong examined plaintiff on July 2, 2008. (AT 354, 356.) In the course of his evaluation, Dr. Wong reviewed plaintiff's medical records and noted plaintiff's chief mental complaints to be depression and anxiety resulting from conflicts with her son and her health problems. (AT 354.) Plaintiff reported wanting to stay in bed and sleep all the time, withdrawing from contact with other people and her family, and experiencing a general loss of interest, but attempting to stay active by watching TV, reading, and sometimes writing cards to friends. (Id.)

Upon examination, Dr. Wong observed that plaintiff was "quite overweight" at about 5'3'' tall and a weight of around 230 pounds. (AT 354-55.) However, he found plaintiff to be neatly dressed and groomed, oriented with no fluctuation in her level of consciousness, easily engaged, and socially appropriate and cooperative. (AT 355.) She exhibited no psychomotor hyperactivity and had good eye contact, a full and well modulated affect, and a mildly depressed mood. (Id.) Her thought form was noted to be linear and well organized, and her thought content was normal. (Id.) Plaintiff's fund of knowledge was intact for current events and her personal history, and she had capacity for "good insight and judgment based on well thought through responses in regards to how [s]he might handle various emergency situations. Response is coherent, logical and shows good prioritization, hence good judgment." (Id.) Dr. Wong found

---

[6] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

plaintiff's attention and concentration to be very good and her memory to be intact. (Id.)

Dr. Wong diagnosed plaintiff with "depression not otherwise specified, relatively chronic and situationally related to her health problems" and a GAF of 70 (at the time of the evaluation and in the previous year).[7]  (AT 355-56.) He assessed plaintiff's mental functional capacity as follows:

> This is a woman who has some depressive symptoms. The depressive symptoms are largely in reaction to situational stresses primarily her health problems. At this time, she is cognitively intact and capable in carrying out simple and complex instructions with no limitations. Her ability to relate to coworkers in the public is perhaps mild to moderately impaired by her decreased stress tolerance, her tendency to get upset, her tendency to just try to withdraw from people. Her ability to maintain an adequate pace and level of endurance in a workplace is mild to moderately impaired by this same pattern. Her ability to relate to supervisor is generally intact. Her ability to adapt to changes in the workplace is mildly to moderately impaired by the factors previously discussed. At this time, her ability to stay consistently aware of safety issues in the workplace is intact. The probability of functional deterioration due to typical workplace stresses is elevated.

(AT 356.)

The ALJ gave reduced weight to Dr. Wong's opinion, in particular his statement that "[t]he probability of functional deterioration due to typical workplace stresses is elevated," noting that plaintiff never sought mental health treatment other than reporting stress to her primary care physician, suggesting her depression is not as severe as she suggests." (AT 43-44, 356.) The ALJ also pointed to the opinion of non-examining state agency psychiatrist Dr. Walk, who reviewed plaintiff's medical records and Dr. Wong's report, and opined that plaintiff's mental impairment was not severe and that plaintiff only had mild limitations with respect to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AT 44, 357-67, 369, 371.)

---

[7] GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

The court agrees with plaintiff, at least in part, that the ALJ's characterization of plaintiff merely "reporting stress" to her primary care physician somewhat understates the history of plaintiff's mental impairments. Plaintiff's treatment records note that she had a long-standing history of depression, was at times tearful, and received prescription medication for depression and anxiety. (See, e.g., AT 264-68, 354.) Nevertheless, remand is not warranted here, because substantial evidence in the record as a whole indicates that plaintiff's mental impairments do not preclude work encompassed by the assessed RFC.

As Dr. Wong himself observed, plaintiff had no history of psychiatric hospitalization, did not seek any treatment from a mental health specialist, and the bulk of her medical records related to her orthopedic problems. (AT 354.) Although plaintiff's primary healthcare provider diagnosed plaintiff with recurrent major depression (AT 266), plaintiff was also noted to be stable on her medications, and Dr. Wong actually opined that plaintiff did not have a "history of persistent changes in vegetative function necessary to suggest the presence of a major depressive episode." (AT 354.) Dr. Wong himself essentially assessed mild to moderate mental limitations, and the Ninth Circuit Court of Appeals has previously held that moderate mental limitations do not even require vocational expert testimony. Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007) ("We have not previously held mild or moderate depression to be a sufficiently severe non-exertional limitation that significantly limits a claimant's ability to do work beyond the exertional limitation.")

To the extent that Dr. Wong's extremely vague reference to an "elevated" probability of functional deterioration due to typical workplace stresses can be construed as imposing more than mild to moderate mental limitations, that opinion is conclusory and minimally supported, and can be rejected on that basis. (AT 356.) See Meanel, 172 F.3d at 1114; Magallanes, 881 F.2d at 751. The opinion is contradicted by Dr. Wong's own benign clinical findings and the relatively high GAF score he assessed, as outlined above. It is also inconsistent with the treatment notes of plaintiff's primary care treating physician, Dr. Flores, who generally, apart from discrete periods involving acute stressors such as family issues and surgeries, described her depression as controlled with medication. (See, e.g., AT 266, 457.) On December 16, 2008, Dr. Flores

12

described plaintiff's mental status as "alert, oriented to person, place, and time, normal mood, behavior, speech, dress, motor activity, and thought processes." (AT 400.) As of September 30, 2009, Dr. Flores noted that plaintiff was essentially "negative for depression" and again described her mental status as "alert, oriented to person, place, and time, normal mood, behavior, speech, dress, motor activity, and thought processes." (AT 457-58.) Notably, during her June 23, 2008 consultative evaluation of plaintiff, Dr. Brimmer also observed that plaintiff was "very pleasant and cooperative and seemed to give an adequate history. She speaks in full sentences, uses bilateral hand gestures while talking. She smiles and laughs easily." (AT 350.)

In light of the above, substantial evidence supports the ALJ's determination to give reduced weight to Dr. Wong's opinion, at least to the extent that the opinion significantly limits plaintiff's ability to work beyond the assessed RFC.

Plaintiff argues that because the ALJ herself did not specifically cite all of the above-mentioned reasons for discounting Dr. Wong's opinion, the court should not consider such post-hoc rationalizations for the ALJ's decision. However, the gist of the ALJ's reasoning for discounting Dr. Wong's opinion was that the medical evidence and treatment records did not support the alleged severity of plaintiff's depression and related mental symptoms. (AT 43-44.) Thus, by considering the record evidence outlined above, the court is not inventing a new ground of decision; rather, such evidence is additional support for the ALJ's decision. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1005 n.3 (9th Cir. 2006). In any event, because harmless error analysis applies in judicial review of social security cases, see Curry, 925 F.2d at 1129, the court will not remand a case to an ALJ simply to write up a more detailed decision when the record evidence as a whole clearly shows that remand would be futile.

V.   CONCLUSION

For the foregoing reasons, the court finds that the ALJ's decision was free from prejudicial error and supported by substantial evidence in the record as a whole. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 15) is DENIED.

////

13

    2. The Commissioner's cross-motion for summary judgment (ECF No. 16) is GRANTED.

    3. Judgment is entered for the Commissioner.

    4. The Clerk of Court is directed to close this case and vacate all dates.

    IT IS SO ORDERED.

Dated: August 28, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE